State v. Duestrow.

THE STATE v. DUESTROW, *Appellant.*

Division Two, January 19, 1897.

1. **Criminal Law**: PRACTICE: DISQUALIFICATION OF JUROR: HEARING OF PORTIONS OF TESTIMONY ON FORMER TRIALS. The hearing of portions of the testimony on three former trials will not disqualify a juror, where he testifies that he neither formed nor expressed an opinion as to the guilt of the accused.

2. ———: ———: ———: ABILITY TO SPEAK ENGLISH. A German juror who can read the English language but can not explain the meaning of the words "prejudice" and "bias" does not show such want of knowledge of such language as to disqualify him.

3. ———: ———: TIME OF CHALLENGING JURORS: CONSTITUTIONAL LAW. The act of March 9, 1895 (Laws 1895, p. 165), changing the time allowed defendants in which to challenge jurors in capital cases from forty-eight hours, as theretofore given, to twenty-four hours, is not obnoxious to the constitution of the state or of the United States, being merely a change in procedure, and it is applicable in the trial of crimes committed before its enactment.

State v. Duestrow.

4. ———: ———: EVIDENCE: LEADING QUESTION: DISCRETION OF COURT. It is within the sound discretion of the court to allow leading questions to be asked on the direct examination of a witness, and, even where improperly asked, it will not constitute reversible error.

5. ———: ———: ———: ———. It was proper to allow the prosecuting officer to ask a witness for the state leading questions as to a conversation had with the defendant which had been testified to by the witness at a former trial, but which he then claimed to have forgotten.

6. ———: ———: ———: ———: INSTRUCTION. If error were committed in permitting leading questions to be asked on direct examination, it would be cured by the withdrawal of the testimony of the witness from the consideration of the jury by instruction.

7. ———: ———: MURDER: INSANITY: EVIDENCE. On a trial for murder, where the defense was insanity, evidence was admissible to show that, when drinking, defendant was of a quarrelsome and overbearing disposition, as it tended to shed light upon the question of his sanity by enabling the jury to determine his disposition and the manner of man he was, by comparing his acts at various times with those immediately preceding and accompanying the homicidal act. Such evidence, at most, would not constitute reversible error, since it could not prejudicially affect the rights of defendant.

8. ———: MURDER: EVIDENCE: MOTIVE. On the trial of one for the murder of his wife, evidence tending to show that he was enamored of a courtesan and frequently visited at the house of assignation kept by her is admissible to show motive; and his possession and exhibition of articles which are supposed to give greater sexual pleasure to women may be shown as evidence of abnormal sexual desire and for the purpose of proving a motive to remove any obstacle in the way of its full gratification.

9. ———: ———: REMARKS OF COURT. Remarks of the court to defendant's counsel on a trial for murder, "take as much time as possible" and "I think you are reading for your own amusement," provoked by an exceedingly prolix and extended cross-examination of an expert witness for the state, were not improper as a rebuke for an unnecessary consumption of time.

10. ———: ———: INSANITY: INSTRUCTION. An instruction on a trial for murder declaring that before defendant could be acquitted on the ground of insanity, the law required him to prove it, not beyond a reasonable doubt, but to the reasonable satisfaction of the jury, properly declared the law.

State v. Duestrow.

11. ————: ————: EVIDENCE. On the trial of a husband for the murder of his wife, where there was evidence on the part of the state that about two months before the homicide sounds were heard coming from the bedroom of deceased, as if defendant were beating her, and that the next morning she appeared with a black eye, evidence of deceased's sister that deceased told her that her eye was blackened by the baby bumping his head against her face is inadmissible as being mere hearsay and not a part of the *res gestae*.

12. ————: ————: INSTRUCTIONS: EXCEPTIONS. Where, on a trial for murder in the first degree, the defendant does not, at the time, except to the action of the court in failing to give an instruction for murder in the second degree, he will not be heard to complain of such failure on appeal.

13. ————: HOMICIDE: MURDER IN THE FIRST DEGREE. Where a homicide is committed under circumstances of great cruelty and barbarity, such malignity will supply the place of malice and make the killing a deliberate act, constituting murder at common law and murder in the first degree under the statute.

14. ————: ————: ————. The killing of an infant two years of age by the father and husband, at the same time he killed his wife, gives character to the latter act, and shows it to have been murder in the first degree, where the defense of insanity is not established.

IN BANC.

ON MOTION TO TRANSFER TO COURT IN BANC.

1. Supreme Court: CONSTITUTIONAL AMENDMENT OF 1890: POWERS OF COURT AND DIVISIONS: TRANSFER OF CAUSE TO COURT IN BANC. Under the provisions of the constitutional amendment of 1890, dividing the supreme court into two divisions with concurrent jurisdiction in civil cases, giving division two exclusive jurisdiction in criminal cases, each division to sit separately for hearing and disposing of causes pertaining thereto, and making all laws relating to practice in the supreme court and the rules thereof controlling upon each division, as far as applicable and requiring the judges of a division, when equally divided in opinion in a cause or when a judge dissents or a federal question is involved, to transfer the cause, upon the application of the losing party, to the court for decision, and authorizing such transfer upon the order of the division, the court *in banc* can not review the decision of a division refusing to transfer a cause to the court on the ground that no federal question is involved in the case. (BARCLAY, C. J., and ROBINSON, J., dissenting.)

2. ———: ———: ———. The constitutional amendment of 1890 gives the supreme court no superintending control over a division thereof, and the judgment of a division has the same force and effect as the judgment of the court; and this is true as to the action of a division upon motions filed subsequent to a judgment.

*Appeal from Franklin Circuit Court.*—HON. RUDOLPH HIRZEL, Judge.

AFFIRMED.

MOTION TO TRANSFER TO COURT IN BANC OVERRULED.

The testimony tended to show the following: That defendant and deceased were husband and wife and had been married some four years prior to the homicide; that their family at the time of the killing consisted of themselves, a child, Louis, two years of age, a servant girl named Katie Hahn, and a cook named Annie Mace. They resided at house number 1724, South Compton avenue, in the city of St. Louis. The house was a two-story brick, consisting of some nine or ten rooms. It was situate on the east side of Compton avenue, between Lafayette avenue on the north and the Compton Heights on the south. The entrance was through a shallow front yard, up three or four steps onto a small porch or veranda into the front hall. On the first floor was a parlor, dining room, kitchen, and hallway and a stairway leading from the front door up to the front hall of the second floor; also, a rear stairway, leading from the rear hall up to the second floor. On the second floor there was in front, facing the hall, a small room; the hall and stairway ran east and west along the north side of the house; adjacent to this small room and south of it, being the main second story front room, was the sleeping apartment of the defendant; next, east of it, the apartment of the deceased; across the hall from the latter and in a bay

window addition to the house was a billiard room; back of the apartment of the deceased and east of it the landing and stairway leading to the first floor in the rear of the house and at the extreme east end of the hall on the second floor the child's room; opposite the room of the defendant and across the hall from it was a stairway inclosed, leading to the third floor or attic, in which and over the apartments of the defendant and the deceased were the rooms of the servant and the cook.

The defendant was engaged in no business, being a young man of leisure and apparent means, but he had a few years prior to the homicide studied medicine at the Missouri Medical College, but failed of graduation.

Prior to the homicide and for the first few years of their married life the defendant and deceased lived apparently a happy life; but about two years before the killing and shortly after the birth of Louis it was shown the defendant became enamored of a courtesan named Clara Howard, residing at 816 South Fourteenth street, in an assignation house there kept by her. Defendant frequently visited her there, remained with her day and night and paid great attention to her; that from the time he began these visits his treatment toward his wife changed; he became distant; came home all hours of the day and night; was frequently intoxicated and abused his wife; called her the vilest of names, and finally and within a period of six months prior to the homicide, assaulted and beat her; kicking her at one time, about two months before the killing, out of the bath room.  One morning she came down out of their room with a black eye. . During the night before she was heard crying by the servant and begging him not to hurt her, that she was innocent.  This was about the middle of the night.  Sounds were also

heard as of a terrible pounding. That he spent a great deal of his time shortly before the homicide with his mistress; that the very day of the tragedy he was with Clara Howard in her room from about 10 o'clock till about 11:30 o'clock in the morning; that about 11:30 A. M. on the day of the killing he left his mistress apparently in a bad humor and spent the balance of the time between the time he left her and the time of the killing at various saloons drinking, carousing, and quarreling.

That the day of the homicide, the thirteenth of February, 1894, was a cold day, and that there was considerable snow and ice on the ground, in fact, the sidewalks and streets were covered with ice and snow and were very slippery. That up to 4 P. M. of that day defendant sojourned at several saloons located between Clara Howard's house and his home; that at 2 o'clock he ordered a sleigh at a livery stable, situated at Ohio and Lafayette avenues, being about five blocks east of his home; that he remained in the saloon of one Von der Berg, across the street from the livery stable, drinkieg, carousing, and quarreling, until about 4 P. M., at which time he crossed the street, got in the sleigh previously ordered, being partially intoxicated, and ordered the driver to drive to his residence through the Compton Heights (a beautiful residence district to the south and east of his residence); that on the way he ordered the driver to make a short turn; that the driver warned him it might break the pole of the sleigh, to which defendant responded in a surly mood, "damn the pole, I can afford to get another one;" that as they approached the house, coming from the south on Compton avenue, the deceased was standing in her room, at the dressing case near the window, on the south side of the building, engaged in dressing herself prepara-

tory to going out to purchase a valentine for a little relative in return for one sent to little Louis; that Katie Hahn with the child in her arms was in the same room; that from her position at the window Mrs. Duestrow saw the defendant, as he approached in the sleigh from the south and stated, ''Here comes the doctor [as he was familiarly known]; I wonder if he is coming to take me out sleighing,'' and directed the servant to go down stairs and ask him.

The girl with the baby in her arms went down the front steps into the front hall and opened the front door; that the defendant meanwhile had directed the driver to stop in front of his house; as the sleigh stopped, he, defendant, stumbled out of the sleigh and up his front steps onto the porch or veranda and met Katie Hahn at the front door just as she opened it; the defendant said to her ''you damned bitch you haven't any business to open the door for me;'' she then followed Duestrow up stairs, and when they got up there, Mrs. Duestrow said to him, ''Arthur, are you going to take me out sleigh riding?'' and he said, ''Yes, and get ready in a damn big hurry, too,'' and she started to dress, and was very glad to go with him. He then started to go in the baby's play room, and was talking about his play things and was looking at them, the toys he had sent up. The baby then came out of the play room and went into his mother's room, and defendant soon thereafter followed and commenced scolding right away. He called Mrs. Duestrow and the witness damned bitches and asked Mrs. Duestrow if she was keeping a whore house, and said he could prove it; he had had a detective watching them for six months, and called them vile names one after another. He then attempted to hit Katie Hahn, and Mrs. Duestrow said ''Arthur, don't hit a stranger; if you hit anybody, hit me,'' he then hit her with his hand in the

face.  She then went toward the window sill, against the pane, when he attempted to hit her again, when Mrs. Duestrow again said, "Don't, Arthur, if you want to hit anybody, hit me," and he said, "All right," and he hit Mrs. Duestrow again—two slaps and one punch in the side.  The third time he hit her she fell towards the bed, when he said, "There you damned bitches you are nothing any more, I am going," and took the baby on his arm and went down the front stairway.  And after a few minutes he came back upstairs into the room where Mrs. Duestrow and Katie were, with his pistol. The witness stated that it seemed like he drew the pistol out of his hip pocket, and Mrs. Duestrow said, "Don't fool with your pistol, dear, you must be drunk;" and he said, "No, I am not drunk, I will show you whether I am drunk or not," and as she saw and heard that, she ran to her room upstairs.  He pointed the pistol at both of them.  When Katie got upstairs, she heard Mrs. Duestrow pleading, "Please, Arthur, don't for the sake of your father, and for the sake of your mother," to which he replied, "I don't care."

While she was up there near the landing, she heard a shot in the hall, and immediately opened the door, when she saw Mrs. Duestrow in the act of dropping, defendant at the time said, "Tina, bist du todt?" She didn't answer.  The child was standing on the opposite side of its mother, and he reached for it, and he held it with one hand, and with the other he held the pistol against the child's heart.  She turned her head, and as she did so heard a shot, and immediately thereafter heard another in the same hallway.  She at once went out on the street, and, seeing the sleigh in front of the house, told the driver what had occurred and left; the driver hurriedly drove to the stable to get assistance and meanwhile defendant, dropping the child and the pistol, hurriedly left the house, bareheaded, but with

his overcoat on; that he proceeded north on Compton avenue one half block to Lafayette avenue and west on the south side of Lafayette avenue in the direction of the Reservoir Park Police Station, situated at Grand and Lafayette avenues, about four blocks west of Compton; that as he proceeded along the sidewalk he staggered, either from drink or the slippery condition of the sidewalk, or both; that after proceeding about one half way to the station, and while walking west on the south side of Lafayette avenue, he met a teamster driving east, accosted him, told him that he had killed his wife and child, and asked to be hauled to the station; the driver helped him on the wagon, turned around and drove to the police station; on the way defendant pointed to an abrasion on his forehead, asked the driver to examine his head, and if he didn't think there was a hole in his (defendant's) head; the place on his forehead looked like a place "skinned," and some of it looked like powder burns; at the station defendant was turned over to the officer in charge, and again stated that he had killed his wife and child, but claimed it was all an accident, repeating the latter statement voluntarily several times to the officer in charge; a few hours later, about 7 P. M., he was transferred by Sergeant Gregory, of the police department, to the main station.

A few minutes after the shooting Sergeant Gregory had gone to the house, found the child lying in the hall, near the door to the billiard room, dead, with two bullet wounds, one in the chest, the other in the head on the right side an inch above the right ear, the wife lying close to the child with three bullet wounds in the head, bleeding profusely and unconscious; it was shown that death of deceased was caused by these three gun shot wounds of the head, on February 17, 1894, although deceased was under the care of skillful physicians and

surgeons from immediately after the shooting until death; the pistol, a Colt's six-shooter, covered with blood, was found lying on the floor of the hall a few feet from the body of the child and of the wife, with six empty chambers recently discharged; several bullet holes were found in the wall adjoining the door to the billiard hall, one being imbedded and one found on the floor; these bullet holes in the wall were surrounded with and bespattered by blood and brain matter; at 7 P. M., when Sergeant Gregory saw defendant at the Reservoir Station, defendant told him that he had shot his wife and child; Gregory asked him why he did it. Defendant said he came in his house, hollered up to his wife, told her to get ready to go out sleigh riding. At the same time he pulled the pistol out of his overcoat pocket and started to throw it up to her. She hollered to him for God's sake not to do it; it might go off. He then went up the steps, met his wife on the second landing and she started to take the pistol out of his hand. Just as she got hold of it the pistol went off and kept going off and shot his wife and baby both. He said she had the child in her arms all the time. The sergeant asked him how many shots were fired. He said he did not know; could not remember; that as soon as he saw his wife was shot he went out of the house and to the police station. Defendant then asked how his wife and child were, when he was told there was some hope of his wife, but that his child was dead, *when* he said he *knew that*.

When Sergeant Gregory at 7 P. M. started to take defendant over to the main station in the police wagon he placed handcuffs on the defendant, as is usual in such cases. Defendant resented it; said he ought not to be subjected to the disgrace; was told it was customary, then began to inquire about his wife, whether she was dead; asked not to

be taken to jail; didn't want to be locked up; asked to send for his attorney, Mr. James L. Blair, and to be permitted to give bail; said he could furnish bail for $1,000,000; asked the sergeant whether he thought he, defendant, was guilty of murder. This question as to defendant being guilty of murder was repeated three times as he was on the way to the main station.

The defense was insanity at the time of the commission of the homicide, and in support thereof testimony was offered tending to establish such insanity, as follows:

That the mother and father of the defendant were addicted to the use in large quantities of alcoholic beverages; that as a result thereof they were often intoxicated. There was some evidence that the mother of the defendant prior to his birth was in the habit of consuming large quantities of beer and wine and was intoxicated therefrom; that in his early youth the defendant was a child of about an average normal condition until about his twelfth year; that then he began to exhibit a condition of excessive nervousness and exhibited unusual fear and cowardice; that he was slow and stupid at school, unable to grasp the subject-matter of the instruction, in fact, an unusually poor scholar; that notwithstanding the fact that he had extra private tutors, who sought to aid him in his study after school, he still was unable to keep up with the average scholars of his age; that he was unusually easily frightened. It was narrated that at fourteen years of age he was afraid to go on the streets but a short distance at night without having a servant of his father's family accompany him; that at an early age he carried (and that by permission of his parents) pistols, shotguns, and knives; that from his fourteenth year he gradually became addicted to the use of intoxicants, and the habit grew on him so that when he had attained his majority

he had become a confirmed drunkard; that at about that time he attended the Missouri Medical College, was unable to make any progress, or at all understand the lectures; that he was very irregular at college, spent a great deal of his time in barrooms and other places carousing, and that the habit of drink continued to grow on him; that at college he imagined everyone, including the scholars and professors, were conspiring against him for the purpose of preventing his graduation; that he spoke of the scholars as "sheenies" (the fact being that a goodly number of young Hebrew students attended the lectures), and that finally he failed to graduate and never matriculated; that between this time and the time of the homicide he frequently, when drinking, would suddenly stop in the course of conversation, and for a few moments or a minute "stare" at one spot or into vacancy; that at one time in a saloon while playing cards he suddenly stopped, apparently became unconscious and began to "stare," and when addressed and requested to play on, paid no attention; at other times in saloons while drinking he would suddenly grasp a man by the arm, stare at him a few minutes, apparently unconscious, and then release his hold; at one time in a carpenter shop adjoining a saloon where he was in the habit of frequenting, he suddenly grabbed hold of a man by the coat, shook him, and without any apparent reason, began discharging his pistol into the floor; that at another time, at about midnight, in the neighborhood of a saloon where defendant frequented, he accosted a police officer, asked him where the Planter's House was located and told him he had an engagement to meet Gen. Sherman there; at another time at the same place he accosted the same officer, who lived within sight of the saloon, told the officer that he was a health officer of East St. Louis, and was looking for an insane patient, a young

lady supposed to be at the house of the officer (the fact being that the officer had taken into his employ a young servant girl who had a short time previously left the employ of defendant); at another time, at or near midnight he (defendant) came from the direction of his house to the house of a neighbor living in the next block with a pistol in his hand, claiming that he was looking for burglars, and that he nearly took him, the friend, for a burglar, and would have shot him; that he was nervous and excited, and would only return home upon being accompanied thither by his friend and assured that he, the neighbor, would at once go to the police station and report it; that defendant at all times was afraid of burglars; that he always was armed and had plenty of firearms and knives about the house; that he frequently got up at night and searched the house and premises, claiming to have heard burglars, when, as a matter of fact, there were none to be seen nor traces of them to be found; that on one night he met a friend a half block from defendant's house; that defendant pointed a pistol at his friend, claimed he was a robber and that he was going to shoot him; that another night defendant hurriedly went to a neighbor's house, a young physician, who had been a classmate of defendant, that defendant was excited, claimed the servant girl was very sick and had hemorrhages and asked the physician to go with him. Upon arriving at the house the physician found the girl was sick, but only suffering with a slight lung trouble, and that although she had expectorated in a bucket, no blood was found in the sputum; that he acted very strangely at times when subjected to these "staring fits;" that while hunting on a trip to Cuba, Missouri, one night, while in camp, the stock of whisky had been exhausted, they had sent a farmer to a neighboring town to obtain a new supply; about 3 o'clock in the morning, while the defendant

and the rest were sleeping in the tents, the farmer returned with the whisky, and being unable to locate the tent, began to "halloa" as loud as he could; this awoke the defendant; he became greatly alarmed, grabbed his gun and thought they were being attacked, and for a long time could not be pacified; on the same trip a favorite dog of defendant's had its leg broke by being run over by the same wagon in which the party were riding; defendant had the dog killed, and afterward when speaking of him shed tears (they also had whisky on this trip); on the same trip the wagon became stalled in the mud, the driver in urging the horses on beat them, whereupon defendant showed a badge and interfered, claiming he was a member of the Humane Society (such a society exists in St. Louis); on another trip to Cuba, while stopping at a hotel in that town, after carousing one night, eating 'possum and drinking beer, defendant after retiring woke up suddenly about 1 o'clock in the night, called his negro servant who slept next door, claimed he had seen burglars at the window, would not be pacified and sat up the rest of the night until train time, some few hours later; on the same trip while out hunting defendant and a friend sat on a crag of rock resting, defendant took out a cigarette box, handed a cigarette to his friend, gave him a match, with which the latter lit his cigarette; defendant attempted to light his cigarette, but the match went out; instead of taking a light from his friend, he compelled the negro servant to bring him a match.

Testimony was offered tending to show that defendant was a kind husband and father; that prior to the marriage he spoke affectionately of his affianced, took her to theatre and bought her flowers and seemed proud of her; that after the marriage he treated her kindly, furnished her with a nice home, in fact, one of

luxury, bought her costly presents, a magnificent dia-
mond the Christmas before the killing, was affectionate
to his child; on the fourth of July was accustomed to
shoot off fireworks and let up any quantity of balloons;
in winter pulled the child on a sleigh, seemed to be
fond and proud of it for a time, always kissed the child
good-bye and threw kisses at it when he departed,
bought it lots of toys, the evening preceding the killing
brought home a magic lantern and that evening
amused the child with it; that a few days before the
homicide he ordered a floral offering in the shape of a
boot, to be presented to a friend of his, an actor, at a
performance to be held Wednesday evening, February
14, 1894; that on one occasion shortly before the hom-
icide, having had an addition built to his house, and
needing money to pay for it, he applied to the Trust
Company, who had charge of his father's estate as ex-
ecutor, for money, and expressed surprise that the
Trust Company should ask for security; that at a mas-
querade ball given at the Liederkranz Hall about a
year before the homicide he treated his wife as other
men ordinarily treated theirs.

There was no testimony offered by the defense as
to the facts surrounding the homicide; defendant was
not placed on the stand; in fact, during the whole trial
he sat in court quietly reading a newspaper, or pretended
to read it, and never uttered a word.

Evidence was offered by the defense tending to
show that immediately after his incarceration he be-
came morose and sullen; that twice shortly after his
incarceration he attempted to take his own life by
hanging himself in his cell; the first time he was found
hanging from a pillow sheet fastened to the cell win-
dow, and was cut down; the second time a suspender
was found on the cell door; from the time of his incar-
ceration in jail in February until about July he was

very retiring, sullen, and uncommunicative, nearly always in his cell; after July he became friendly, talked with other prisoners and the jail guards; claimed his wife and child were alive; that he was being persecuted by his enemies, notably by the Knights of Pythias (to which order he belonged), for his misdeeds; that there were phonographs and telephones in his cell; that voices were talking in his cell to annoy him; in fact, that he showed every indication of being persecuted by his enemies; shortly after July, and, in fact, after his return from Union in September, 1894, he claimed to have seen his wife in the court-room at Union, also his child; that they were alive; showed the guards cigarette pictures containing pictures of women, claiming they were photographs of his wife; that about that time he began to talk of possessing great powers of mind transferrence; that he could convey odors, the smell of roses from afar into his cell; that he could compel people to do as he wished, to soil their clothing; that he was the surgeon-general of the United States Army by appointment, as a recognition of his great ability; that at the same time he was a cardinal of the Roman Catholic church; that at night he would have numerous candles lighted, claiming that each represented a particular color, and that each color had a peculiar meaning; that he constantly sent messages out to his wife, wrote her numerous letters, and on October 12, 1894, he sent a bouquet to her. (This was her birthday.)

The above facts were testified to by numerous lay witnesses, old friends of the family, barroom acquaintances and others, and by jail guards and the experts in his employ. Most of the lay witnesses declared from the facts they testified to that they believed he was peculiar.

During the trial numerous experts testified, among

them men of national reputation.   Experts on the part of the defense, viz., Drs. J. K. Bauduy, Sr., and J. K. Bauduy, Jr., Dr. Chaddock, Dr. Bremer, Dr. Crandall, Dr. Simon and others, testified to his conduct and vagaries as above narrated from the time that Dr. J. K. Bauduy, Sr., and Dr. J. K. Bauduy, Jr., Dr. Simon and Dr. Bremer began to visit him almost daily, from July, 1894, until the last trial in January, 1896.   These experts, in answer to hypothetical questions propounded by defendant's counsel, declared it as their opinion that the hypothetical defendant was insane at the time of the commission of the homicide, and that he remained insane from that time and after the finding of the indictment, and that he was insane at the time of the trial.   At the time of the homicide they declared he was suffering with alcoholic, epileptic mania, and after his incarceration became afflicted and then was suffering with *paranoia*.   These experts it was shown were in the employ of the defendant almost from the time of the homicide until the trial and received liberal fees, and other fees, it seems, were in prospect.

On the part of the state in rebuttal it was shown: That defendant's mother and father were both prior to and at the time of the marriage and up to the birth of the defendant young Germans of moderate means and temperate habits; that the mother prior to the marriage drank no intoxicants; that prior to the birth of defendant she rarely drank, and then only beer in exceptionally moderate quantities; that prior to the birth of defendant neither the father nor mother of defendant were ever intoxicated, even to the slightest degree; that from the time of the birth of defendant until the death of the father, a few years before the homicide, and the death of the mother a short time after the homicide, neither used intoxicants except in moderation, and neither was ever intoxicated; that

there was no evidence of insanity in either of the parents or their ancestors; that at school the defendant, while not bright, was of an average calibre, and it was testified to by his own principal, Prof. Toensfeldt, and many of his classmates, that there was nothing at all unusual or peculiar about him; that he was somewhat indolent and indifferent in his studies, but otherwise an average young man; that at an early age his father, who had become a man of wealth, allowed him the use of money in considerable quantities, petted and spoiled him, so that at the age of fourteen or fifteen years neither his father nor mother could control him; that he was allowed to do pretty much as he pleased, carried weapons of all kinds and otherwise conducted himself as he saw fit. At that time in his life it was testified to by intimate family friends and by the hired help about the place, those who saw the boy daily, that he was an average child; in fact, at music he was considered an adept; at the medical college it was shown, both by the professors and the students, he was not considered a man of unbalanced mind to any extent; that while he was below the average in obtaining and acquiring knowledge, it was due principally to his lack of application and to his constant resort to saloons and places of amusement, and to his carousals and bad habits, especially to the excessive use of intoxicants up to the time of his marriage and thereafter.

It was shown by those who came in contact with him from time to time that while drinking in saloons he was a man of haughty, overbearing disposition, ever ready to impose upon others and to seek to abuse and intimidate others, but when meeting with resistance, extremely cowardly. It was shown that he would always be armed with a loaded revolver; that when drinking he was abusive, would call people vile names and draw his pistol on the slightest provocation.

One night when returning home late at night intoxicated on the street car he jostled and pushed the conductor and insulted him; finally the conductor, a small-like man, put the defendant, a large man, weighing then over two-hundred pounds, off the car; defendant got angry, pulled out of his hip pocket what appeared to the conductor to be a pistol, and threatened to shoot him; next day he got on the same car, accosted the conductor, reminded him of the incident of the night before and claimed that the article he drew was a whisky glass in the shape of a pistol filled with whisky, which he then presented to the conductor. Another night while drinking he insulted an officer, pulled his, pistol, but returned it when the officer threatened to kill him if he didn't put it up. Another night, returning to his home about 2 a. m. intoxicated, he accosted the private watchman in front of his (defendant's) residence, charged him with neglect of duty in not examining his premises; the watchman claimed he had just come out of the yard, the defendant called him a liar, and said that he (defendant) had set a trap for him (the watchman), and if he had been in the yard he would not have come out alive. The watchman said, if you mean that large dog chained in your yard, I will go in and convince you. Thereupon the watchman went to the dog, grabbed hold of him, unloosened the chain and dragged the dog out of the yard; defendant became angry, called the watchman a s—— of a b—— and started to draw his pistol; the watchman grabbed his own pistol and defied the defendant, whereupon the defendant ran into his house and closed the door. On another occasion defendant was talking with a friend named Michel about hunting dogs. Witness passed, said to Michel, "Herman, if you are talking about dogs, when you go out hunting again you can take my young setter along and train him." De-

fendant immediately turned around to witness, who was much smaller than he, called him an Irish s—— of a b—— and told him not to put in his mouth; witness resented this insult, when Duestrow reached for his pistol. Witness, however, before defendant could draw it, struck him and knocked him into the street.

It was shown by the state that defendant was almost constantly, and especially when drinking, in quarrels brought on by himself. It was shown by intimate friends of defendant, and of his family, from the time of his birth, by schoolmates, classmates at the medical college, barroom attaches where associated, police officers who had known him for years, many of his neighbors at every place at which he lived from the time of his birth up to the day of the homicide, including his neighbors at the place of the killing, those who saw him in his daily walks of life, by the barber who shaved him, by the saloon keeper whom he so freely patronized, by the butcher who sold him his meat daily, by the grocer with whom he dealt, and in fact by each and every one with whom he had at all come in contact, including the family of the deceased, that there never was a time in his life when defendant seemed at all peculiar to them, even to the slightest degree.

It was shown that his associations were bad, his surroundings were not at home immoral, that he spent a good deal of his time with the scum of the town, including the sporting women; that he visited Clara Howard frequently, had colored quartettes serenade her at night, and then would spend the night with her carriage riding, drinking, and carousing.

By a goodly number of the jail guards it was shown that he never after his incarceration indulged in any of his so-called vagaries, either of hypnotism, power of mind transferrence, cardinal of Rome, sur-

geon-general, or wife and child alive; that they saw nothing peculiar about him different from other prisoners, excepting that he always had everything he wanted, including all the reading matter and the daily attendance of his expert witnesses.

By the testimony of the experts of the state, men also of national, and, in fact, some of international reputation, it was shown that they, at the request of the prosecuting officers, began to visit defendant in February, 1895, immediately after the first insanity hearing; that they visited him for the purpose of determining the question of his mental condition; that they were practically without compensation—scarcely enough to defray their expenses. Among them were Dr. C. H. Hughes, Dr. Joseph L. Bauer (since deceased), and Dr. F. P. Norbury, all eminent in the science of alienism; that they visited defendant frequently in jail, conversed with him, observed his action, examined him with his permission, carefully observed his conduct during the three trials in court following the first, took into consideration the fact that when the very matters concerning his supposed delusions were being testified to in open court in his presence, and opinion expressed both of their truth and untruth, he never flinched nor uttered one word of disapprobation. These experts all testified that they saw nothing in his physical make-up, in his manner, conduct, or conversation, or in the facts as testified to by witnesses both for the state and the defense, or either, to indicate insanity, and upon hypothetical questions propounded both by the state and the defense, based upon the evidence in this case in its various phases, unequivocally declared it as their opinion that the hypothetical defendant was not insane at the time of the commission of the homicide, but that he was sane, and that he was not insane at any time since the com-

mission of the homicide and up to the day of the trial. Dr. A. E. Mink stated in substance that he thought Duestrow did not have epilepsy at the time of the commission of the homicide, and that he did not think he had *paranoia*, but that he thought he had chronic alcoholism, which he described as being insanity.

The above is thought to be a sufficient *resume* of the facts presented by the record; others, where necessary, will be noted in the opinion.

The instructions were for murder in the first degree, or an acquittal on the ground of excusable homicide, because of the lack of responsibility of the defendant, the usual instructions as to malice, premeditation and all the elements constituting murder in the first degree; the usual instructions as to credibility of witnesses, reasonable doubt, etc., and complete instructions as to what would excuse homicide because of insanity. The jury returned a verdict of guilty of murder in the first degree.

The following are the instructions given by the court:

"1. Gentlemen of the jury, the court instructs you that the defendant in this case stands charged by the indictment with murder in first degree; that is to say, the defendant, Arthur Duestrow stands charged with having feloniously, willfully, premeditatedly, deliberately and of his malice aforethought shot and killed his wife, Albertine Duestrow, at the city of St. Louis, and state of Missouri, on the thirteenth day of February, 1894, and under the evidence in this case you will either convict the defendant of murder in the first degree and so state in your verdict or you will acquit him.

"2. If you believe and find from the evidence in this cause, that the defendant, Arthur Duestrow, at the city of St. Louis, and state of Missouri, on or about the

thirteenth day of February, 1894, did feloniously, willfully, deliberately, premeditatedly and of his malice aforethought, make an assault upon Albertine Duestrow with a certain loaded pistol, and then and there with said pistol feloniously, willfully, deliberately, premeditatedly and of his malice aforethought did kill the said Albertine Duestrow, by shooting her upon her head and body, and thereby inflicting upon her a mortal wound, of which said wound she, within a year and a day thereafter, died at the said city of St. Louis, during the month of February, 1894, and was thus killed by the shooting aforesaid, as charged in the indictment, then you will find the defendant guilty of murder in the first degree, and will so state in your verdict.

"He who willfully, that is, intentionally, uses upon another, at some vital part, a deadly weapon, such as a loaded pistol, must, in the absence of qualifying facts, be presumed to know that the effect is likely to be death, and knowing this, must be presumed to intend death, which is the probable consequence of such an act, and if such deadly weapon is used without just cause or provocation, he must be presumed to do it wickedly and from a bad heart.

"If, therefore, you find and believe from the evidence in this cause that the defendant took the life of Albertine Duestrow, by shooting her in a vital part with a pistol, with manifest designs to use such weapon upon her, and with sufficient time to deliberate, and fully form the conscious purpose to kill her, and without sufficient or just cause or provocation, then such killing is murder in the first degree.

"And while it devolves upon the state to prove the willfulness, deliberation, premeditation, and malice aforethought, all of which are necessary to constitute murder in the first degree, yet these need not be proved by direct evidence, but may be deduced from all the

facts and circumstances attending the killing, and if you can satisfactorily and reasonably infer their exist-tence, from all the evidence, you will be warranted in finding the defendant guilty of murder in the first de-gree.

"3.   As used in the indictment and these instruc-tions, 'feloniously' means wrongfully and wickedly and also refers to the punishment imposed by law.

" 'Willfully' means intentionally and not done by accident.

" 'Premeditatedly' means thought of beforehand, for any length of time, however short.

" 'Deliberately' means done in a cool state of the blood, not in sudden passion, engendered by lawful or some just cause of provocation.

"And the court instructs the jury that in this case there is no evidence tending to show the existence of any such passion or provocation.

" 'Malice' means that condition of the mind which prompts one to do a wrongful act intentionally, and to take the life of another without legal justification or excuse.

"It does not mean mere spite, hatred, or illwill, but it signifies the state of disposition which shows a heart regardless of social duty, and fatally bent on mischief, and 'malice aforethought' means that the act was done with malice and premeditation.

" 'Malice,' as used here, may be presumed from the intentional use of a deadly weapon in a manner likely to produce death.

"4.   The court further instructs the jury that, if they believe and find from the evidence that the de-fendant made any statement or statements in relation to the homicide, after said homicide is alleged to have been committed, the jury must consider such state-ment or statements altogether.

"The defendant is entitled to the benefit of what he said for himself, if true, and the state is entitled to the benefit of anything he said against himself in any statement or statements proven by the state; what the defendant said against himself the law presumes to be true, because said against himself; what the defendant said for himself, the jury are not bound to believe, because it was said in a statement or statements proven by the state; but the jury may believe, or disbelieve it, as it is shown to be true or false by the evidence in this cause. It is for the jury to consider, under all the circumstances, how much of the whole statement or statements of the defendant, proved by the state, the jury, from the evidence in this cause, deem worthy of belief.

"If you find and believe, however, from the evidence, that the defendant, at the time he made any statement concerning the crime charged, and his connection therewith, was insane, and not of sufficient mind and memory to understand or comprehend what he was saying, then such statement or statements made by defendant, while in such condition, you will not consider.

"5.    The court instructs you that the defendant, in law, is presumed to be innocent, and that it devolves upon the state to prove, by evidence, to the satisfaction of the jury, beyond a reasonable doubt, that the defendant committed the crime, as charged in the indictment and explained in these instructions, and if, upon a view of the whole case, you have a reasonable doubt of defendant's guilt, you will give him the benefit thereof, and acquit him.

"But a reasonable doubt, to authorize an acquittal on that ground, must be a substantial doubt of defendant's guilt, formed on the careful consideration of all the facts and circumstances proven in the case, and not a mere possibility of the defendant's innocence.

"6.  Insanity is interposed by the counsel of the defendant, as an excuse for the charge set forth in the indictment.  This defense, when established, is one the law recognizes, and should insanity be proven, by the evidence in the case, to the reasonable satisfaction of the jury, it would be the duty of the jury, in that event, to acquit the defendant altogether.

"Insanity is a physical disease, located in the brain, which disease so prevents and deranges one or more of the mental and moral faculties, so far as to render the person suffering from this affliction incapable of distinguishing right from wrong, in reference to the particular act charged against him, and incapable of understanding that the particular act in question was the violation of the law of God and of society. Wherefore the court instructs the jury, that if they believe and find from the evidence, that at the time he did the killing charged in the indictment, the defendant was so perverted and deranged in one or more of his mental and moral faculties, as to be incapable of understanding, at the moment he killed Albertine Duestrow, that such killing was wrong, and that he, the defendant, at the time was incapable of understanding that this act of killing was a violation of the laws of God and of society; if the jury find he was so insane, they should find him not guilty. .

"Insanity is either partial or general.

"General alienations always excuse.

"Partial insanity does not always excuse.

"One may be partially insane and yet be responsible for his criminal act.

"The law does not excuse, unless the derangement is so great that it actually renders the person incapable, at the time of its commission, of distinguishing between right and wrong in the particular act charged and proved against him.

"The law presumes every person who has reached the years of discretion to be of sound mind, and this presumption continues until the contrary is shown.

"So that when, as in this case, insanity is pleaded as a defense to a criminal charge, the fact of the existence of such insanity at the time of the commission of the homicide charged, must, before you can acquit on that ground, be established by the evidence to your reasonable satisfaction, and the burden of proving this fact rests with the defendant.

"To establish the insanity of the defendant, positive and direct proof of it is not required.

"To entitle him to an acquittal by the reason of his insanity, circumstantial evidence which reasonably satisfies your mind of its existence is sufficient.

"As the law presumes the defendant innocent, the burden of proving him guilty rests with the state, and before you should convict him, his guilt must be established beyond a reasonable doubt.

"On the other hand, to entitle the defendant to a verdict of not guilty, by reason of his insanity, the law requires him to prove it, not, however, beyond a reasonable doubt, but only to your reasonable satisfaction.

"From all this, it follows, that although you may believe and find that the defendant did the killing alleged, yet if from the evidence you further find that at the time he did it he was in such an insane condition of mind that he did not know he was doing wrong, and did not comprehend the nature and character of the act, then such shooting was not, in law or in fact, malicious or felonious, and you ought to acquit him on the grounds of insanity, and by your verdict so say.

"The court instructs the jury that if they find the defendant not guilty, on the ground that he was insane,

at the time of the commission of the homicide charged, they will so state in their verdict, and they will also state whether the defendant has entirely, and permanently, recovered from such insanity.

"7. The court further instructs you that you must determine from all the facts and circumstances proven in the case, whether or not the defendant was sane or insane at the time of the killing of his wife.

"If you find, from all the evidence, that the defendant, at the time of the killing, had the capacity to distinguish between right and wrong, as to the particular act with which he stands charged; that he knew his act was criminal and wrong, and would deserve punishment, then in law he had a criminal intent, and is not so far insane as to be exempt from responsibilities.

"On the other hand, if you find that at the time of the killing of his wife the defendant was insane or of unsound mind, from any disease or disorder of mind, and by reason thereof was not conscious of what he was doing when he fired the pistol at his wife; that he did not know the nature of the act he was about to commit, when he fired the pistol; that he did not know the act was criminal, and would subject him to punishment; that he had no capacity to distinguish right from wrong, as to the act with which he is charged, or that he was impelled by an insane impulse, and his powers were so impaired by disease, that he could not restrain from doing the act, then the defendant is not responsible in law, and you should find him not guilty.

"8. On the question of the sanity or insanity of the defendant, you will consider all the evidence offered in the case, the homicide itself and the attending circumstances, the life, habits and conduct of the defendant, as well as his mental capacity or perverseness, if any, from his birth up to the present time, and also the habits and conduct of his parents, to determine

whether or not the defendant was of sound or unsound mind at the time of the commission of the crime charged.

"If you find that the defendant was insane and irresponsible from any disease or disorder of mind, as explained in these instructions, when he committed the homicide, then you will find him not guilty; but if you find that at the time of the shooting he was not insane, but responsible for his act, as explained in these instructions, and that he committed the crime as charged, then you will find him guilty, even though you may find that he has become insane since the homicide, or that he is now insane.

"9. If you believe and find from the evidence, at the time the defendant shot his wife, his mental faculties had become, and were, so perverted and deranged as to render him incapable of distinguishing between right and wrong, and of knowing the right from wrong of that particular act, then it is immaterial what caused such condition of his mind, whether the same was brought on by hereditary disease, or was the result of the excessive use of alcoholic beverages and stimulants, or of any disease or other cause, or combination of causes.

"And though you should believe from the evidence that such perverted and deranged mental faculties of the defendant were the result of continued drunkenness, or the excessive or continued use of intoxicants, such deranged and perverted condition of mind is entitled to the same consideration as a diseased and unsound condition of mind from any other cause, and entitle the defendant to an acquittal at your hands, if shown and proven to your reasonable satisfaction.

"10. If you believe and find from the evidence, that the defendant, from any cause whatsoever, had become insane and irresponsible in law, as explained in

the foregoing instructions, and that he was so insane and irresponsible at the time of the killing, by reason of any mental disease or disorder arising from any cause whatsoever, then you will find the defendant not guilty, although you may believe that the defendant killed his wife while he was intoxicated or drunk.

"Drunkenness is a species of insanity and is attended with a temporary loss of reason and power of self-control; drunkenness, however, is voluntary, brought on by the act of the party, while insanity proper is an affliction of Providence, for which the party affected is not responsible.

"Such insanity is a full and complete defense to a criminal charge, drunkenness is none; therefore, if you believe from the evidence that the defendant, Arthur Duestrow, voluntarily made himself intoxicated, and while so intoxicated, killed his wife in a fit of drunkenness or temporary insanity, which was the result of that intoxication, then he is responsible in law for such killing and you should so find.

"11. Voluntary drunkenness is neither an excuse for crime, nor a mitigation of crime.

"If you find and believe, from the evidence, that the defendant, at the time of the homicide, had not become insane and irresponsible, as explained in these instructions, either from the continued excessive use of intoxicating drinks, or from any other cause or causes, but that the defendant has been voluntarily addicted to the use of intoxicants for a long period prior to the homicide, and that shortly, or immediately, before the homicide the defendant voluntarily drank large quantities of intoxicating stimulants or beverages, and that being under the influence of such intoxicants he shot and killed his wife, while laboring under temporary frenzy or madness, and while being unconscious of the nature of the act, and that such temporary frenzy

and madness, and such unconsciousness, was then and there the immediate result of alcoholic liquor or liquors, voluntarily drank by the defendant, then such temporary frenzy or madness, and such unconsciousness, affords neither justification, mitigation, or excuse for the shooting of his wife by defendant, nor can you consider it in determining whether the defendant acted willfully, deliberately, and premeditatedly, and he is equally guilty under the law, as if he had been sober or sane at the time of the shooting; and in case, as in the case of a sober and sane man, the intent to kill and malice may be presumed from the intentional use of a deadly weapon upon a vital part of the body, in a manner likely to produce death, and premeditation and deliberation may be inferred from the facts and circumstances of the killing, where there was sufficient time to consider, and in the absence of justification or just provocation, and need not be shown by direct and positive proof.

"Therefore, if you believe and find from the evidence, that the defendant, under the circumstances, and while being in the condition aforesaid, and by the means and in the manner charged in the indictment, and explained by instructions numbers 1, 2, and 3 herein, shot and killed his wife, Albertine Duestrow, then you will find the defendant guilty of murder in the first degree, and so state in your verdict.

"12. While in a case of homicide the jury may properly consider the motive which prompted the commission of the act itself, or the want of motive, if none be shown, and while the want of motive in such case is a circumstance in favor of defendant's innocence, to be considered by the jury; yet if you find in this case that no motive was shown, and you further find and believe that beyond a reasonable doubt that the defendant shot and killed his wife, as charged, then you

State v. Duestrow.

should find the defendant guilty, regardless of any proof of motive.

"13. The testimony given by the physicians and experts, who testified in this case, is to be taken and considered by the jury like the evidence of other witnesses who testified in the cause; and the opinions on questions of insanity, which have been given by medical experts, on proper testimony before you, are subject to the same rule of credit or discredit as the testimony of other witnesses, and are not conclusive on the jury.

"These opinions neither established nor tend to establish the truth of the facts upon which they are based; whether the matters testified to by the witnesses in the cause, as facts, are true or false, is to be determined by the jury alone, and you must also determine whether the facts and matters stated and submitted to the experts in the hypothetical questions are true in fact, and have been proven in the case.

"14. The jury are the sole judges of the credibility of the witnesses, and of the weight and value to be given to their testimony.

"In determining such credibility, weight and value, the jury should take into consideration the character of the witnesses, their manner on the witness stand, their interest, if any, in the result, their relation to or feeling for or against the defendant or deceased, the probability or improbability of their statements, as well as all the facts and circumstances given in evidence in this cause, and in this connection you are instructed, that if you shall believe from the evidence that any witness has willfully testified falsely to any material facts in this cause, you are at liberty to disregard the whole or any part of such witness' testimony.

"14 1-2. The court further instructs the jury, that in the consideration of this case, they will disregard

all the testimony of the witness Eggling, as well as all the statements made or read during his examination, and all the questions asked of him on his examination.

"15. If you find the defendant guilty, as charged in this case, you must find him guilty of murder in the first degree, as charged in the indictment, and so state in your verdict, and in such case you have nothing to do concerning the assessment of the punishment.

"If you find the defendant not guilty, on account of insanity, you will so state in your verdict, and in such case you will also ascertain from the evidence, and state in your verdict, whether the defendant has or has not entirely and permanently recovered from such insanity."

*Charles P. Johnson, Charles T. Noland,* and *J. W. Booth* for appellant.

(1) The venireman, Phillip Heeger, having attended the three prior trials of this cause and heard portions of the evidence and read newspaper reports of the trials, giving the evidence, was thereby incompetent to serve as a juror, regardless of whether he acknowledged to have formed an opinion or not. R. S. 1889, secs. 4197, 4203, 6060, 6083; *State v. Bryant,* 93 Mo., 280, 297; *State v. Culler,* 82 Mo. 626; *State v. Waters,* 62 Mo. 196; Thomp. & Mer. on Juries, secs. 213, 214; *Ex parte Vermilyea,* 6 Cow. 555; *People v. Vermilyea,* 7 Cow. 122; *Studley v. Hall,* 22 Me. 201; *State v. Walton,* 74 Mo. 270, cases cited in 12 Am. and Eng. Ency. of Law, p. 355; *Dugle v. State,* 100 Ind. 259. His inability to understand the meaning of the words "prejudice" and "bias" taken in connection with his whole *voir dire* examination showed that he did not sufficiently understand the English language or possess sufficient intelligence to serve as a juror in a capital case. *Lyles v.*

State v. Duestrow.

*State*, 41 Tex. 176; *Mining Co. v. Rousseau*, 28 La. Ann. 579; *People v. Arseo*, 32 Cal. 40; Thomp. & Mer. on Juries, sec. 177, and cases cited. (2) The law of 1895 (Laws, p. 165) reducing from forty-eight to twenty-four hours the time in which defendants in capital cases may make their peremptory challenges is, as to this defendant, *ex post facto* and void. Art. 15, sec. 2, const. of Mo.; art. 1, sec. 10, const. U. S.; *Kring v. Missouri*, 107 U. S. 221: *People ex rel. v. McDonald*, 29 Lawyers' Rep. Annotated, 834. (3) It was reversible error for the court to permit the state to recall its own witness, Eggling, and over objections of defendant, and lead, cross-examine, and impeach him by questions as to what he had sworn to at a former trial. 1 Greenl. on Ev., secs. 442, 444, and notes; 1 Roscoe, Crim. Ev. [9 Am. Ed.], *244–250; Phillips on Ev. [10 Ed.], C. & H. Ed., notes *985, 986; 1 Whar. on Ev. [2 Ed.], secs. 549–551; 29 Am. and Eng. Ency. of Law, pp. 812, 813, 814, 815; 16 Central Law Journal, 325, and authorities cited; *Chism v. State*, 70 Miss. 742; *State v. Burks*, 132 Mo. 363; *Dunn v. Dunnaker*, 87 Mo. 597; *McDaniel v. State*, 53 Ga. 253; *Guthrie v. Martin*, 52 Mo. App. 513; *People v. Mitchell*, 94 Cal. 550; *Quinn v. State*, 14 Ind. 589. The instruction to disregard the testimony of this witness did not cure the error. *Chism v. State*, 70 Miss. 742; 5 Baxter (Tenn.), 619. (4) Evidence as to previous quarrels or difficulties between defendant and strangers should have been excluded upon defendant's objections. Evidence of extraneous misconduct was not admissible in this case. Wharton, Crim. Ev. [9 Ed.], secs. 29–32, 46–50; Bishop, Crim. Pr., sec. 493; *State v. Martin*, 74 Mo. 547; *State v. Parker*, 96 Mo. 382; *State v. Jackson*, 95 Mo. 649; *State v. Crawford*, 115 Mo. 630; *Abernathy v. Com.*, 101 Pa. St. 322; *Com. v. Campbell*, 80 Mass. 541; *People v. Doyle*, 21 Mich. 221; *People v. Stout*, 66 Mo. 208. (5) Before a witness can testify

to an opinion, as to a defendant's sanity or insanity, that witness must first state the facts and his means of observation, and the court may then decide whether the facts testified to and his means of observation are such as to justify the expression of an opinion of the defendant's mental condition.    Rogers on Expert Testimony [2 Ed.], pp. 7, 8; *Bank v. Wirebank*, 106 Pa. St. 37; *People v. Levy*, 71 Cal. 618; Lawson on Expert and Opinion Ev., p. 476, n. 3, and p. 539; *State v. Crisp*, 126 Mo. 605; *Fayette v. Chesterville*, 77 Me. 22; *Prentis v. Bates*, 93 Mich. 234; *Horab v. Knox*, 87 N. C. 483; *State v. Baldwin*, 12 Mo. 223.    (6)    The court committed prejudicial error by stating to defendant's counsel, in the hearing of the jury, when engaged in the cross-examination of an expert witness, "I think you are reading it for your own amusement," and, "Take as much time as possible." Thompson on Charging the Jury, secs. 53, 54, 55, citing *State v. Harkin*, 7 Nev. 377; *McMinn v. Whelan*, 27 Cal. 319; *Fuhrman v. Mayor*, 54 Ala. 263; *Hair v. Little*, 28 Ala. 236; *Andrews v. Ketcham*, 77 Ill. 377; *Reiger v. Davis*, 67 N. C. 185; *State v. Simmons*, 6 Jones L. 21.    (7)    The court's instructions were erroneous in that: *First*.    They required defendant to prove his insanity to the satisfaction of the jury, without regard to the evidence adduced from the state's witnesses; thus shifting the burden of proof from the state to defendant. *Davis v. U. S.*, 160 U. S. 459; *State v. Hickam*, 95 Mo. 322; 1 Bishop on Crim.    Proced.    [4 Ed.],    secs. 1049–1051.    *Second.* There was no evidence to sustain the instructions given by the court, upon voluntary drunkenness being no excuse, justification, or mitigation to the charge, even though the defendant may have been unconscious at the time of the homicide and the instructions were misleading.    (8)    The court erred in failing to instruct the jury upon murder in the second degree.    *State v. Hill*,

69 Mo. 451; *State v. Robinson*, 73 Mo. 308; *State v. Talbot*, 73 Mo. 347; *State v. Tabor*, 94 Mo. 595; *State v. Lowe*, 93 Mo. 574; *State v. Lewis*, 74 Mo. 221. (9) The court erred in refusing to permit defendant to prove by Miss Louise Leisse, a sister of deceased, Albertine Duestrow, that on the same morning that Katie Hahn testified Mrs. Duestrow appeared with a black eye, after she (Katie Hahn) had heard sounds as though defendant was beating his wife, Mrs. Duestrow told Miss Louise Leisse that her eye became blackened by the baby (Louis) striking or bumping his head against her face. The statements of Mrs. Duestrow, which were made to her sister, Louise Leisse, and which were offered to be proven, were part of the *res gestae*. *Railroad v. O'Brien*, 119 U. S. 99; *Leahey v. Railroad*, 97 Mo. 165; *State v. Leabo*, 84 Mo. 168; *State v. Young*, 119 Mo. 522; *State v. Punshon*, 124 Mo. 457; *Murphy v. Railroad*, 66 Barb. 125; *State v. Thompson*, 132 Mo. 301; 1 Phillips on Ev., sec. 183; 1 Greenlf. on Ev., secs. 102, 147, 148, 149.

*R. F. Walker*, attorney general, and *Morton Jourdan*, assistant attorney general, for the state.

(1) The allegations in defendant's motion for new trial that the court erred in refusing his instructions, that the verdict was against the evidence and the result of prejudice, that the officers in charge of the jury were guilty of misconduct, that the jury were prejudiced by the hanging of a dummy near the courthouse during the trial and that a number of jurors were prejudiced and biased against defendant, of which defendant had no knowledge until after their examination upon their *voir dire* and after his challenges, can not be sustained for the reason that none of them find support, authority, or warrant in the record in this case,

and hence, inasmuch as allegations in motions for new trial do not prove themselves, but in order to be reviewed here should be predicated upon some fact appearing in the record, they will not avail the defendant. *State v. Welsor*, 117 Mo. 570; *State v. Foster*, 115 Mo. 448; *State v. Cantlin*, 118 Mo. 100. (2) No error was committed in retaining the juror, Heeger, on the jury. He was not prejudiced against defendant and sufficiently understood the English language. *State v. Taylor*, 134 Mo. 109; *Com. v. Taylor*, 18 Atl. Rep. 158; *Allison v. Com.*, 99 Pa. St. 32; 3 Rice, Crim. Ev., 202. (3) The act of 1895 (Laws, p. 165) changing the time in which defendant was required to make his challenges from forty-eight hours to twenty-four hours is a valid enactment, violated no constitutional right of defendant, and is not an *ex post facto* law. *State v. Taylor*, 134 Mo. 109; Cooley, Const. Lim. [6 Ed.], pp. 326, 327; *Gut v. Minnesota*, 9 Wall. 35; *Cummings v. Mo.*, 4 Wall. 326; *State v. Jackson*, 105 Mo. 196; *People v. McDonald*, 42 Pac. Rep. 15. (4) The admission and exclusion of answers of witness Eggling will not be considered by this court for the reason that the entire testimony of the witness was excluded from the consideration of the jury by instruction given at defendant's request. (5) Two rules have been well established in this state regarding the testimony of opinions as to the question of the sanity or insanity of the defendant. The rule as to non-experts being that they may be permitted to state their opinions in connection with the particular conduct and expression of the defendant from which they form the basis of their judgment. They are required to give the court and the jury the facts existing within their knowledge. *State v. Williamson*, 106 Mo. 171; *State v. Bryant*, 93 Mo. 273; *State v. Baber*, 74 Mo. 292. Expert witnesses may testify their opinions as to the

sanity or insanity of the defendant without having seen the defendant or noted his conduct or expressions, but may do so upon the hypothetical case which hypothetical case should embrace the facts in substance as they exist and as they have been detailed by the witnesses. *State v. Williamson, supra.* In the examination of both the expert and nonexpert witnesses these two rules have been carefully followed and in no instance in this voluminous record will this court find a substantial violation of either of said rules. (6) The court properly refused to permit defendant's counsel to prove the declaration of Mrs. Duestrow alleged to have been made with reference to Katie Hahn's testimony regarding Mrs. Duestrow coming down one morning with a black eye. It was not part of the *res gestae,* and was wholly immaterial. (7) The remarks of the judge to Messrs. Dryden and Booth as to the time consumed by them in the cross-examination of one of the expert witnesses for the state was proper and no ground of error. (8) The objection to the question as to what articles Duestrow purchased and brought back with him from his wedding tour in France and exhibited to a number of persons in St. Louis was properly overruled. The character and purposes of these articles tended to show the defendant's trend of mind, his associations, his habits, his immorality and his occupation during his idle moments, and they were among the multitude of facts and circumstances to which the jury were entitled, where the life, character and habits of the defendant were being shown with a view to establish his insanity and lack of responsibility. (9) The instructions in this case are in the usual and improved forms and clearly define and fully cover all issues presented by the indictment and the testimony. The only instruction asked by the defendant, number

$14\frac{1}{2}$, was given by the court. The instructions as given covered the entire case, and hence the complaint in the motion for new trial, that the court failed to fully instruct the jury upon all questions of law, is without merit. An examination of the instructions in this case will disclose the fact that they have been carefully selected from approved forms which have been used in other cases of murder where the defense was insanity.

*E. C. Crow*, attorney general, for the state, upon the motion to transfer to the court *in banc*.

SHERWOOD, J.—Upon the facts contained in the foregoing and accompanying statement, we are to determine the validity of the various errors assigned on behalf of defendant; they are twelve in number.

1. Relative to the retention on the panel of the juror Heeger, as to which exception was saved, it appears that he had heard only fragmentary portions of the testimony adduced at three former trials, two of which were confined to the sole issue of insanity, and the last was a mistrial on the issue of defendant's guilt of the crime charged. Heeger having other business in town, would occasionally drop into the courthouse and listen a few moments to the testimony, but in all the trials he had not been in the courtroom much more than an hour.

These facts bring this case fully within the ruling announced in *State v. Taylor*, 134 Mo. 109. We went over the subject quite extensively in that case, and do not care to do so again. Besides, defendant in his challenge for cause does not charge that Heeger had formed or expressed an opinion from what he had seen in the papers or heard from the witnesses, and if this had been done it would have been amply refuted by

the singularly frank statements of the old German farmer, showing in a manner not to be misunderstood that he had neither formed nor expressed an opinion upon the guilt of the accused, and had no feeling against the plea of insanity; very sensibly adding, however, that he would not believe in insanity *unless it were proven.*

The challenge for cause, as already stated, is not based on any of these grounds, but upon the ground "that said Heeger was prejudiced against the defendant, and could not afford defendant a fair trial, and did not sufficiently understand the English language to properly act as a juror." In what the alleged prejudice consisted is not pointed out, and the lack of sufficient knowledge of the English language is based upon the fact that Heeger, though he could read English, could not explain the meanings of the words *"prejudice"* and *"bias."* This inability of Heeger readily to define, or his hesitancy in defining these words, we do not regard as sufficient to disqualify him from fully discharging his duties as juror, and if they did, his inability or hesitancy would be shared by many respectable citizens of this state.

2.   No valid objection can be taken against the law of 1895 (laws of that year, p. 165 *et seq.*), because it was enacted after the commission of the crime charged in the indictment. That law simply shortened the time for making challenges from forty-eight to twenty-four hours, and constituted but a change in the mere method of procedure, and as such is not obnoxious to the charge of unconstitutionality, either under the national or state constitutions. Such methods of procedure are subject to the will of the legislature, and do not, speaking in a general way, impinge any vested or substantial rights of a party accused. *State v. Taylor,* 134 Mo. *loc. cit.* 143 *et seq.* and cases cited.

3. Error is asserted to have occurred in allowing the state to recall its own witness, one E. C. Eggling, Jr., and ask him leading questions. Repeated decisions of this court have established that it is matter resting in the sound discretion of the court whether, in any case, leading questions shall be asked, and if asked, though improperly, this does not constitue reversible error.

Eggling, on a previous trial occurring but a few months before, had testified to a conversation which had taken place between him and defendant the night before the homicide, in regard to some sewering, which witness was to do, and in the same short conversation, defendant, speaking in reference to his wife, said, "I will get rid of that son of a b——some time." This latter portion of the conversation witness could not recollect, or so pretended. This conduct on the part of this recalcitrant witness, furnished ample ground for asking him direct questions, questions otherwise inadmissible only in case of cross-examination.

Touching the point in hand, Greenleaf says: "In some cases, however, leading questions are permitted, even in a *direct* examination,—namely, where the witness appears to be hostile to the party producing him, or in the interest of the other party, or unwilling to give evidence; or where an omission in his testimony is evidently caused by want of recollection, which a suggestion may assist.  *  *  *  So, where, from the nature of the case, the mind of the witness can not be directed to the subject of inquiry, without a particular specification of it; as where he is called to contradict another, as to the contents of a letter, which is lost, and can not, without suggestion, recollect all its contents, the particular passage may be suggested to him.  *  *  *  Indeed, when and under what circumstances a leading question may be put, is a matter

resting in the sound discretion of the court, and not a matter which can be assigned for error." 1 Greenl., Evid. [14 Ed.], sec. 435, and cases cited. See, also, 2 Elliott's Gen. Prac., sec. 613.

The above cited authorities fully justify the asking of the questions propounded to this unwilling witness, and it was unnecessary for the state to plead surprise or of having been misled, since both those elements were patent to the most casual observation, since nothing could more conduce to surprise than to have a witness who had previously testified to the whole of a short conversation, but a few months before, and then, afterwards *forget, or pretend to forget,* the latter and more striking portion of that conversation in relation to threats made against the life of the wife. And such right to ask the hostile witness leading questions, was not at all affected by reason of the fact that the witness was *recalled* for that purpose. Nor was it affected by reason of the fact that such questions had a tendency to show that the witness had been *tampered* with by the party who was greatly interested in procuring or producing a lapse of memory on the part of the non-remembering witness. Nor does it at all affect the propriety of such questions that they may *incidentally* have the effect of impeaching such witness. Courts should not be averse to letting in the light of day on such reprehensible transactions. The lower court, however, out of abundant caution gave, at the instance of defendant, an instruction which excluded the testimony of Eggling, worthless as it was, from the consideration of the jury; so that even if error was committed in this regard, which we do not admit, it would have been cured by the instruction given.

4. Error, it is urged, was committed in the admission of testimony on the part of the state tending to show that defendant, when drinking, would be quarrel-

some, apt to draw his pistol, and prone to be bullying toward those with whom he came in contact, and who would not resist him.

The object of the introduction of this evidence seems to have been to show what manner of man defendant was, in order that the jury might the more readily determine the disposition of defendant, make comparison between his acts at various times and those which immediately preceded and accompanied the homicidal act, and thus be enabled to form a more correct idea of whether defendant was insane at the time the fatal act occurred. It is difficult to fix the range of legitimate inquiry in such cases. It would seem it ought to embrace within its comprehensive scope substantially all of the material portions of the party's previous life; certainly everything tending to shed light on the then pending investigation. But apart from such considerations, we are not prepared to hold that such evidence being introduced would constitute reversible error, since it does not appear that its introduction could have prejudicially affected the rights of defendant. Besides it was not like a case where evidence is introduced as to the commission of other crimes by a person accused.

5. As to the introduction of testimony tending to show that defendant was enamored of a courtesan by the name of Clara Howard, and frequently visited her at her house of assignation kept by her, and stayed all night; such evidence was admissible as showing a motive which might prompt defendant to rid himself of his wife. Whart. Crim. Evid. [9 Ed.], sec. 785.

6. Intimately connected with these frequent adulteries of defendant, was the fact of his possession and exhibition of certain articles which are supposed to give greater sexual pleasure to women, as defendant stated. Now if adultery is admissible to be shown as

furnishing a motive for the commission of a crime, certainly such evidence would be greatly strengthened by showing also a lecherous disposition on the part of the adulterer, which prompted the purchase, possession and exhibition of the articles aforesaid. In a word, the more intense the lascivious feeling and passion, the stronger would probably be the motive to remove any obstacle in the way of the full gratification of such abnormal sexual desire. Under this view, evidence of the possession and exhibition of such articles was not inadmissible; in fact, quite pertinent.

7. Next for discussion is the correctness of the action of the trial court in reference to the admission of the expert and nonexpert testimony on the part of the state respecting the sanity or insanity of defendant. The hypothetical questions propounded to the experts fully outlined all material facts necessary to base an opinion regarding the sanity or insanity of defendant, and no more than this could be required. Indeed the hypothetical questions put to the experts on behalf of the state were the same in substance and perhaps literally as those put by defendant's counsel to his own experts.

As to the non-experts who testified on the part of the state, some had more acquaintance with defendant than others, but all had sufficient acquaintance to be able to judge of his sanity, and as to the opportunities of such non-experts to form correct opinions, the jury could best determine as the triers of the facts.

8. No error occurred in the remarks made by the court to one of counsel for defendant, "Take as much time as possible," and "I think you are reading for your own amusement." These remarks were brought out by an exceedingly prolix and extended cross-examination of Dr. Bauer, and it was not improper for the court in this way to rebuke the wholly unnecessary

consumption of time. And in any event, no prejudice could occur to defendant by reason of such remarks. *State v. Musick*, 101 Mo. *loc. cit.* 273.

9. The instructions, fifteen in number, fully covered every phase of the case and left nothing to be desired. They embraced all the issues presented by the allegations of the indictment and the testimony. They are approved by many decisions of this court. One of the instructions in regard to insanity, as pointed out in the brief of counsel for the state, has received our frequent approval; the clause complained of in the instruction is the following: "To entitle the defendant to a verdict of not guilty by reason of his insanity, the law requires him to prove it; not, however, beyond a reasonable doubt, but only to your reasonable satisfaction." As the instructions will accompany this opinion, it is deemed unnecessary to quote them at length.

10. There was abundant evidence to show that defendant was voluntarily intoxicated at the time of the homicide, and thus to support an instruction on that point, so that the objection on that score is unsustained by the record.

11. Some two months preceding the homicide, Katie Hahn heard sounds proceeding from Mrs. Duestrow's bedchamber as if defendant were beating his wife, and the next morning she appeared with a black eye, and it was proposed by defendant to prove at the trial by Miss Louise Leisse, that Mrs. Duestrow, her sister, told her that her eye was blackened by the boy Louis bumping his head against her face. This proposed statement was no part of the *res gestae;* was mere hearsay, and therefore properly rejected. We will not dignify this point by discussing it; there was no error in excluding such a statement.

12. It is asserted that the court should have instructed the jury on murder in the second degree. We

are of a different opinion and for several reasons: In the first place, in order to take advantage of any omission by the trial court in this respect, defendant should at the close of the giving of instructions on behalf of the state, have excepted because the jury had not been instructed upon all questions of law, etc. *State v. Cantlin*, 118 Mo. *loc. cit.* 111; *State v. Paxton*, 126 Mo. *loc. cit.* 514, and other cases.

An answer equally good to defendant's contention on this point is found in the circumstances of the homicidal act, which gave origin to the present prosecution. Defendant, after accusing his wife in the grossest terms of improper conduct, slaps her twice in the face and then with a blow of his huge fist strikes her in the side and knocks her over against the bed, then points the pistol at her and when remonstrated with by her and asked not to fool with his pistol, that he must be drunk, replies, "No, I am not drunk—I will show you whether I am drunk or not," and then the servant fled up stairs, then she heard the now thoroughly alarmed wife pleading in vain for mercy to one in whose brutalized bosom no mercy dwelt, then a shot is heard, and the servant rushing down stairs sees the wife prostrate on the floor of the hall and defendant kneeling beside her asks if she is dead, then the servant sees him seize his little boy, about two years old, press the pistol to his child's breast, and as she turned her head away and ran down stairs, she heard a shot and then another. Afterward the wife was found fatally wounded on the floor of the hall, in an unconscious condition, her face powder-burned, with three bullet wounds in her head, the child shot through the breast and head, an empty revolver on the floor with six empty chambers recently discharged, marks of bullets on the walls and clots of blood and brains on the floor.

It is well settled at common law, still in force in this state, that when a homicide is committed in circumstances of great barbarity and cruelty, such brutal malignity will supply the place of malice, and make the act of killing equivalent to a deliberate act of slaughter, murder at common law and murder in the first degree under our statute. *State v. Kloss,* 117 Mo. 591, and cases cited.

If, then, defendant was sane at the time he did the shooting, and so the jury have found, he was guilty of nothing less than murder in the first degree. Again, it can not be doubted that defendant, if criminally responsible, was guilty of a higher grade of murder than that of the second degree when he shot his boy. This act being coincident and concurrent with that of shooting the wife, gives color and import to the act of shooting the wife. If shooting the boy was murder in the first degree, so, also, sanity existing, was the act of shooting the wife.

13. Finally, it is claimed that the verdict was against the evidence and should be ascribed to prejudice. To the jury exclusively belonged the determination of the sanity of the defendant; that being affirmatively determined, the question of defendant's guilt followed as the necessary and only corollary of such prior determination. There are no indications of prejudice on the part of the jury that we can discover in this voluminous record of over two thousand, five hundred type-written pages. On the part of defendant there were disclosed such features of intelligence, such a distinct memory of what had transpired at the homicide, such a sense of danger and apprehension from the act done, such an anxiety to know the grade of offense and to describe the act as an accident, such a desire to escape punishment by clumsy attempts at simulating insanity that no wonder an honest jury of Franklin

county found the verdict they did. We therefore affirm the judgment and direct that the sentence pronounced by the law be executed.   All concur.

IN BANC, FEBRUARY 11, 1897.   ON MOTION TO TRANSFER
TO COURT IN BANC.

MACFARLANE, J.—The constitutional amendment discussed in the opinion is as follows:

"Section 1.   The supreme court shall consist of seven judges, and, after the first Monday in January, 1891, shall be divided into two divisions as follows: One division to consist of four judges of the court, and to be known as division number one; the other to consist of the remaining judges, and to be known as division number two.   The divisions shall sit separately for the hearing and disposition of causes and matters pertaining thereto, and shall have concurrent jurisdiction of all matters and causes in the supreme court, except that division number two shall have exclusive cognizance of all criminal cases pending in said court, provided that a cause therein may be transferred to the court as provided in section 4 of this amendment.   The division of business, of which said divisions have concurrent jurisdiction, shall be made as the supreme court may determine.   A majority of the judges of a division shall constitute a quorum thereof, and all orders, judgments and decrees of either division, as to causes and matters pending before it, shall have the force and effect of those of the court.

"Sec. 2.   Upon the adoption of this amendment, the governor shall appoint two additional judges of the supreme court, who shall hold their offices until the first Monday in January, 1893, and at the general election in the year 1892 their successors shall be

elected, who shall hold their offices for the term of ten years, as other judges of the supreme court. The two judges appointed by the governor, together with the judge elected at the general election in the year 1890, shall constitute division number two, and the remaining judges shall constitute division number one. The court shall elect its chief justice and each division a presiding judge thereof.

"Sec. 3. The supreme court shall assign to each division the causes and matters to be heard by it, of which assignment due public notice shall be given; and all laws relating to practice in the supreme court, as well as the rules of the supreme court, shall apply to each division so far as they may be applicable thereto. The opinion of each division shall be in writing, and shall be filed in the causes in which they shall be respectively made during the term at which the cause is submitted, and such opinions shall be a part of the records of the supreme court. Each division shall have authority to issue the original writs and exercise the powers enumerated in section three of article six of the constitution.

"Sec. 4. When the judges of a division are equally divided in opinion in a cause, or where a judge of a division dissents from the opinion therein, or where a federal question is involved, the cause, on the application of the losing party, shall be transferred to the court for its decision; or, where a division in which a cause is pending shall so order, the cause shall be transferred to the court for its decision.

"Sec. 5. Whenever, in the opinion of the supreme court, the state of its docket with reference to the speedy disposition of the business of the court will justify dispensing with the divisions hereinbefore provided, the court shall dispense therewith, and the court shall thereafter hear and determine all causes

pending in it: Provided, however, that the court shall have the power to again divide itself into two divisions, in like manner and with like power and effect as hereinbefore provided, whenever, in the opinion of six judges thereof, entered of record, the condition of its docket with reference to the speedy disposition of the business of the court shall so require, and in such division the four judges oldest in commission shall constitute division number one, and the remaining judges division number two.

"Sec. 6. All provisions of the constitution of the state and all laws thereof not consistent with this amendment shall, upon its adoption, be forever rescinded and of no effect."

Defendant was convicted by the circuit court of Franklin county of murder in the first degree, and from the sentence he appealed to the supreme court. The appeal was heard by division two of the court, and the judgment of the circuit court was affirmed. After an unsuccessful motion for a rehearing, a motion was filed in said division to transfer the cause to the court *in banc* for a rehearing, on the ground that a federal question was involved. This motion said division also overruled, holding that no federal question was involved. Defendant now makes application to the court, sitting *in banc*, to order said cause transferred for a rehearing therein for the same reason urged in the division; namely, that the proceedings involve a federal question.

The only question directly presented for our consideration on this motion, is, whether the court, sitting *in banc*, has power, under the amendment to the constitution adopted in 1890, to review the action of a division of the court and determine whether a federal question is involved and to order a transfer of a case

to the court *in banc* after such division has unanimously decided that there is no federal question in the case.

By section 1 the court is divided into two divisions. Division two, consisting of three judges, is given exclusive cognizance of all criminal cases. Division one has only civil jurisdiction. Each division has concurrent jurisdiction in civil cases. The divisions are required to sit separately for hearing and disposition of causes and matters pertaining thereto. Section 3 provides that all laws relating to practice in the supreme court, as well as the rules of the supreme court, shall apply to each division so far as they may be applicable thereto, and requires the opinions of the divisions to be in writing and filed in the causes in which they shall be respectively made.

Division number two is thus given exclusive and independent jurisdiction of all criminal cases. Its jurisdiction is as independent of the court as it is of division one. It is the court of last resort in all criminal cases. No superintending control is reserved over it, nor does an appeal or writ of error lie from it to the court.

But section 4 does provide for transferring causes from a division to the court in certain cases. That section reads as follows:

"Sec. 4. When the judges of a division are equally divided in opinion in a cause, or where a judge of a division dissents from the opinion therein, or where a federal question is involved, the cause, on the application of the losing party, shall be transferred to the court for its decision; or, where a division in which a cause is pending shall so order, the cause shall be transferred to the court for its decision."

Does this section give to the court *in banc* the power claimed by defendant under his motion? We are of the opinion that it does not.

It can not be said that this section gives to the supreme court superintending control over a division. By the original constitution the supreme court has superintending control over inferior courts only. But a division can not be said to be inferior to the court. The judgment of a division has the same force and effect as the judgment of the court. Neither the subject-matter of the suit, the amount in dispute, nor the question involved, distinguishes the jurisdiction of the court from that of a division. The court, and the divisions, therefore, have concurrent jurisdiction in civil matters and division two has exclusive jurisdiction in criminal cases. The divisions are not, therefore, inferior courts within the meaning of article 4, section 3, of the constitution which gives the supreme court superintending control over inferior courts.

Nor is such power of control inherent in the court. The highest courts of this country do not represent the sovereignty as formerly did the court of King's bench in England, in which the inherent power to control all inferior courts resided. In this country the superintending power of one court over another, if it exists at all, does so by virtue of constitutional or statutory authority. The power of supervision resides in the supreme court of Missouri only by virtue of the sovereign authority of the people expressed in their constitution. High, Extra. Leg. Rem., ch. 12.

No power is given the court to control, in any respect, the disposition of criminal causes or matters pertaining to them, but all laws relating to practice in the supreme court, as well as the rules of the supreme court, as far as they may be applicable thereto, shall apply to their disposition.

Motions filed subsequent to a judgment in a cause are matters pertaining thereto and must be filed in the division which rendered the judgment. If the deter-

mination of such a motion requires the finding of a fact or the settlement of a legal question, such division must hear and decide it. They are given the same power to decide matters of that kind as to decide the case itself, and their judgments on such matters are as conclusive. A writ of error, or a motion in the court *in banc* intended to subserve the same purpose, no more lies from a judgment on a motion, than from the judgment on the merits. In each case the judgment of a division is the judgment of a court of last resort, and ends the matter decided. .

The existence or non-existence of a federal question in a cause may sometimes be in doubt and judges may differ in their opinion on the question. Yet a division of the court is fully as competent to determine that question as the more important one involving the merits of the case, in which the power is not, and indeed can not be, disputed. Its unanimous judgment on incidental questions is also conclusive.

In this case division two heard the appeal on its merits. The application to transfer was properly made to it. The right to a transfer depended upon whether a federal question was involved. That was a question for that division to settle. It did so by finding that no federal question was involved, or, as the application was denied, we must presume it so found. The court sitting *in banc* is given no power to review that decision.

Defendant's motion is overruled. BARCLAY, C. J., and ROBINSON, J., dissent. The other judges concur.

BARCLAY, C. J. (*dissenting*).—1. Section 4 of the constitutional amendment of 1890 confers an absolute right to a transfer to the court in banc when certain facts exist. Then, "the cause, on the application of the losing party, shall be transferred to the court for its decision."

Our learned brethren construe this language to mean that the application can not be made to the court in banc.

The learned opinion of our brother MACFARLANE does not decide whether a federal question is involved in the *Duestrow* case. That point is treated as wholly immaterial. The opinion proceeds on the theory that the court in banc has, in no event, authority to order a cause heard before the entire court, even though the facts bring the cause within the terms of the first part of the fourth section.

Viewing the amendment of 1890 as a whole, it seems to us, with due respect, that the construction thus placed upon it is faulty.

In our opinion a losing party (entitled under section 4 to have his cause transferred to the court in banc) may apply to that court for such a transfer and obtain it, if the division in which the cause is pending should refuse it.

The cases that reach the supreme court do not pass entirely out of, and beyond, its jurisdiction by being assigned to a division of the court for hearing. It is expressly declared by section 3 that "the supreme court shall assign to each division the causes and matters to be heard by it." It is not there said (because it goes without saying and is obviously implied) that the supreme court may assign to itself, the court in banc, causes to be heard by it. And it would, in our opinion, be its duty (when duly requested) to assign for a hearing in the court in banc any cause in which a party becomes entitled to such a hearing as of right, under the terms of section 4. According to the theory of the learned opinion of the majority, when a cause is once committed to a division, the supreme court loses control of it, and from that time the division alone may determine where it shall be heard. We respectfully

VOL. 137 mo—7

dissent from that view. A cause pending in a division is still pending in the supreme court, and may, at any stage, be assigned by the supreme court, for hearing in its proper place. This we consider the true spirit and intent of the amendment of 1890. To hold otherwise will introduce the possibility of the growth of two different systems of jurisprudence, administered under one roof.

If each division stands united, it may adopt its own view of the law, and there will be no possibility of action thereon by the whole court in the interest of that unity in our jurisprudence which the terms of our organic law, touching appellate courts, have for many years been aiming to secure. *Const. Amendt.*, 1884, sec. 6. Enough of conflict in our final decisions arises from the mere division of appellate jurisdiction; but the chance of such conflict will be greatly increased by the adoption of the theory now approved by a majority of our learned brethren. The court in banc—the supreme court—should be held to be the court of final resort, and it should be held to have (at all times while the cause is pending) control of every case for the purpose of assigning it for hearing. The divisions were not intended by the constitution to be independent of each other and of the court in banc, so that the latter should be powerless to order a case heard before it, if a party is entitled to such a hearing.

The fact that the *Duestrow* case is a criminal one does not impair the right of transfer to the court in banc. The second division has "exclusive cognizance of all criminal cases," but it is further declared, in the same connection (section 1), that such a criminal cause "may be transferred to the court as provided in section 4 of this amendment." So whatever right of transfer to the court in banc is given by the fourth section, exists in criminal, as well as in civil cases.

We consider that the supreme court has power to assign the *Duestrow* case to the court in banc for a hearing "on the application of the losing party," assuming that the case involves a federal question, and as such comes within the mandatory clause of section 4.

The right to such a hearing is a valuable right, for, if a rehearing in banc be had, the defendant is entitled to submit for review there the whole case, not merely the federal question. If the right to a rehearing in banc is refused, the ruling can not be said to be harmless, since any review of the divisional judgment that might be obtained in the federal jurisdiction would be limited to a review of the federal question.

2. In the early part of the trial in the *Duestrow* case on the circuit, the court refused to allow defendant 48 hours within which to make his peremptory challenges of jurors. He would have had that time under the law in force at the date of his indictment in 1894 (R. S. 1889, sec. 4204). But the court applied to the case the act of 1895 (Laws, 1895, p. 165, sec. 4204) which allows only 24 hours for such challenges in prosecutions of this kind. (The last trial began in January, 1896.) The counsel for defendant claimed, at the time of said ruling, defendant's right to have 48 hours for challenges, on the ground that the law reducing the time to 24 hours was a violation "of the constitution of the United States in the clause which provides that no bill of attainder or *ex post facto* law shall be passed." His counsel then added: "This presents a federal question which the defendant now claims the protection of." But the learned circuit judge overruled said objection, and defendant duly saved exception.

Defendant also objected to being tried under the 24 hours law, on other grounds, but we are not concerned with them at this time.

In defendant's motion for new trial he repeated said objections, and claimed explicitly that the change of law (providing that the list of qualified jurors should be delivered to defendant 24 hours before the trial) was "as to this defendant and this case, an *ex post facto* law, and void under the operation and effect of sec. 10 of art. 1 of the constitution of the United States of America, and in violation of the rights of this defendant, as a citizen of the United States, secured to him by said provision of said constitution."

In the brief and argument filed on behalf of the defendant in the second division of the supreme court, the above point is repeated, and elaborated. The learned opinion of affirmance by that division discussed the question so raised, as appears in the second paragraph of the opinion. It was then held that the change of law referred to was "not obnoxious to the charge of unconstitutionality, either under the national or state constitutions."

A question is "involved" when it arises for decision. *Duncan v. Missouri* (1894) 152 U. S. 377.

Even when a constitutional question has been so irregularly raised as to be inseparably mingled with another issue, precluding a direct decision upon the first question, the majority of the court in banc have held that the constitutional question is sufficiently "involved" to confer appellate jurisdiction on that ground. *McCarty v. O'Bryan* (1896), *post*, p. 584; 38 S. W. Rep. 456.

The United States supreme court has lately defined an *ex post facto* law to be "one which imposes a punishment for an act which was not punishable at the time it was committed; or an additional punishment to that then prescribed; or changes the rules of evidence by which less or different testimony is sufficient to convict than was then required; or, in short, in

relation to the offense or its consequences, alters the situation of the party to his disadvantage." *Duncan v. Missouri* (1894) 152 U. S. 382.

Whatever our own view might be, touching the validity of the Missouri law of 1895 as applied to the *Duestrow* case, we can not know in advance what view might be taken of that law by the federal supreme court when applying as a test the rule above quoted. In the state of facts shown in this case, it seems to us that where the defendant has invoked, unsuccessfully, the constitution of the United States, a federal question under the judiciary act of 1789 is fairly presented, within the rulings of the supreme court of the United States indicating what a federal question is. *Kring v. Missouri* (1882) 107 U. S. 221; *Stanley v. Schwalby* (1896) 162 U. S. 255.

Such a federal question we consider to be within the reach of the fourth section of the amendment of 1890 to the Missouri constitution. When such a question is involved, we believe that the defendant is entitled to a review of the whole case by the court in banc. Whether or not it is involved, in a given state of facts, is a question of law (sometimes of difficulty), which should be decided by the court in banc when properly invoked to decide it.

The merits of the federal question are not now before this court, and we regard them as foreign to the present discussion.

We regret being obliged to differ from our learned colleagues. But the importance of the case appears to demand a statement of our position, and of the reasons that have led us thereto. With all respect due our learned brethren, we find ourselves unable to concur in their judgment denying the motion for a transfer to the court in banc. Judge ROBINSON concurs in this opinion.